UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIGBY ADLER GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>MERCEDES-BENZ U.S.A., LLC,<br><br>Defendant. | Case No. 14-cv-02349-TEH<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS** |

This matter comes before the Court on Defendant's motion to dismiss Plaintiff's Second Amended Complaint. (Docket No. 24). After carefully considering the Parties' written and oral arguments, the Court hereby GRANTS IN PART AND DENIES IN PART Defendant's motion to dismiss for the reasons set forth below.

**BACKGROUND**

Plaintiff Digby Adler Group, LLC, is a California company that rents vans to clients, many of whom are touring bands and musicians. After the company's CEO drove an earlier version of the Mercedes-Benz Sprinter van while traveling in Europe, Plaintiff decided to make the van its flagship vehicle. Plaintiff claims that the Sprinter van was unique at the time of its adoption by the company, both in its size and in the features that it offered, such as a separate cargo hold that secures expensive cargo.

In 2007, Defendant Mercedes-Benz USA released a second generation Sprinter van in the United States. This new model offered a "passenger" configuration that included a high-performance, roof-mounted air conditioning unit. After buying the new vans, Plaintiff alleges that it noticed that the air conditioning units experienced significant leaks. The Second Amended Complaint ("SAC") states that Plaintiff purchased at least 98 Sprinter vans between January 2010 and January 2014, at least 83 of which experienced leaks. Some leaks occurred after steady rain, while other leaks occurred after the unit

1  operated on high at its coldest setting. Plaintiff alleges that the leaks damaged the vehicles
2  and installed fixtures, as well as customers' cargo. As a result, Plaintiff had to reimburse
3  customers for the inconvenience and damaged cargo, pay the cost to repair the damage to
4  their vans, and incur the cost of having the vans sit unused while they dried out.

5        Plaintiff alleges that after bringing the leaks to the attention of Defendant, it was
6  "repeatedly assured" that (1) Defendant was aware of the problem with the air
7  conditioning units, and (2) that the issue would be (or was) resolved. The SAC provides
8  two examples of these assurances. First, in May 2009, Eric Gierst, Chrysler's Regional
9  Fleet Service Manager, allegedly issued a "fix" that Plaintiff believed would resolve the
10  problem. Second, in August and September of 2013, Plaintiff was allegedly told by Gale
11  Young, Mercedes' After Sales Technical and Operations Manager, that:

> We have some progress, a new seal, new work instructions but there is another issue effecting the vehicles a leak caused by Condensation from the evaporator when running the AC of full cold with high blower settings. R&D in Germany is confirming a certain repair procedure that may be performed in addition to replacing a blower control relay. [sic]

16  SAC ¶ 47. Additionally, the SAC references a 2010 Technical Service Bulletin that
17  instructed technicians on how to fix the leaks, as a basis for Plaintiff's belief that
18  Defendant had (1) identified the issue, and (2) the problem would be fixed in subsequent
19  model years. As a result of these assurances, Plaintiff says it continued to buy new model
20  years - each year encountering the leaking problem anew, each year complaining to
21  Defendant, and each year allegedly receiving some assurance that the problem would be
22  fixed.

23        Despite these alleged assurances, the SAC claims that Defendant never made any
24  changes to the vans to address the problem. Consequently, Plaintiff brought a class action
25  lawsuit against Defendant for design defect product liability and unfair business practices,
26  as well as an individual claim for actual fraud and a request for declaratory relief.
27  Defendant filed the present motion to dismiss, Plaintiff timely opposed (Docket No. 26),
28  and Defendant replied (Docket No. 30). Oral argument was heard on April 6, 2015.

**LEGAL STANDARD**

Dismissal is appropriate under Federal Rule of Civil Procedure 12(b)(6) when a plaintiff's allegations fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Specifically, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," with sufficient specificity to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In ruling on a motion to dismiss, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). However, a court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 129. Rather, it must "examine whether conclusory allegations follow from the description of facts as alleged." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (citation omitted). In this regard, a court is "free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Farm Credit Services v. American State Bank*, 339 F.3d 764, 767 (8th Cir. 2003) (citation omitted). Nonetheless, dismissal for failure to state a claim under Rule 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).

///
///
///
///

**DISCUSSION**

**I.   Fraud**

"In order for a plaintiff to prevail on a fraud claim, he must show: (a) misrepresentation of fact (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Harlan v. Roadtrek Motorhomes, Inc.*, No. 07-0686, 2009 WL 928309, at *19 (Apr. 2, 2009 S.D. Cal.) (citing *Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 (1997)).

Claims of fraud are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud." Claims sounding in fraud must allege "the account of the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

Plaintiff bases its fraud claims on alleged affirmative misrepresentations made by Defendant or its representatives. Specifically, the SAC claims that it was misled by Defendant' reputation, as well as alleged assurances by Defendant that "fixes had been issued to resolve the problems[.]" SAC ¶ 50. The allegations in the SAC, however, fail to state a claim for "actual fraud," fall far short of the heightened pleading standard required. Moreover, Plaintiff cannot now rely on a nondisclosure theory of fraud, as this theory was included in its First Amended Complaint ("FAC") but abandoned in the SAC.

**A.   Defendant's Reputation is not a Basis for Fraud.**

Plaintiff first attempts to base its claim for actual fraud on Defendant's reputation. SAC ¶¶ 44, 49-50. However, marketing statements, such as Defendant's claim that the Sprinter vans are "award-winning vehicles," are non-actionable puffery and cannot form the basis of a fraud claim. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000,

4

1015 (9th Cir. 2003) (holding that "statements [that are] generalized, vague and unspecific assertions, constitute[e] mere 'puffery,'" and cannot form the basis of a fraud claim).

### B. The 2010 Technical Service Bulletin is not a Basis for Fraud.

Similarly, Plaintiff's fraud claim cannot be based upon the 2010 Technical Service Bulletin issued by Defendant. Plaintiff states that this bulletin addressed how to fix the leaks, and alleges that its issuance furthered Plaintiff's belief that "the problem would be fixed in subsequent model years." SAC ¶ 16. However, this bulletin is not actionable for multiple reasons. First, the Court has no reason to believe that this bulletin was issued to Plaintiff. Therefore, it is not plausible that the bulletin was a misrepresentation made to Plaintiff with the intent of inducing reliance. Second, California law provides that an automaker's service bulletins are not to be "construed as an admission . . . of the existence or nonexistence of a vehicle defect." Cal. Civ. Code § 1795.91. It follows that Plaintiff cannot allege that the bulletin was an assurance made to purchasers (past or potential) about the existence or nonexistence of a defect in current or future Sprinter vans. Finally, the SAC does not provide the actual content of the bulletin, and therefore fails to satisfy the heightened pleading standard required for claims of fraud.[1] *See Swartz*, 476 F.3d at 764 (claims of fraud must include "the account of the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentations").

### C. The Alleged Fraudulent Assurances Are Factually Insufficient.

The alleged fraudulent assurances made by Defendant are factually insufficient to provide a basis for Plaintiff's claim of fraud. The SAC first claims that Eric Gierst, Chrysler's Regional Fleet Service Manager, issued a fix that was supposed to resolve the

---

[1] Defendant asks the Court to judicially notice what it believes to be the referenced Technical Service Bulletin. (Docket No. 25). The Court GRANTS Defendant's request because the bulletin is incorporated by reference into the SAC and forms the basis of one of Plaintiff's claims. *See Hoey v. Sony Electronics Inc.*, 515 F. Supp. 2d 1099, 1103 (N.D. Cal. 2007) (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

leaking problem. SAC ¶ 16, 47.  This allegation fails to support a claim of fraud for multiple reasons.  Most importantly, if Gierst was a Chrysler employee, he does not appear to have any authority to make statements on behalf of Defendant Mercedes-Benz.  *See Saldate v. Wilshire Credit Corp.*, 686 F. Supp. 2d 1051, 1065 (E.D. Cal. 2010) (holding that, when asserting a fraud claim against a corporation, the plaintiff "must allege the names of the persons who made the allegedly fraudulent representations, [and] their authority to speak").  Even assuming Gierst had the authority to speak on behalf of Defendant, the SAC lacks any specific details regarding the content of Gierst's representation, which is required to satisfy the pleading standard.  *Minkler v. Apple*, *Inc.*, No. 13-5332-EJD, 2014 WL 4100613, at *6 (N.D. Cal. Aug 20, 2014) (complaint "must plead the . . . 'specific content of the false representations'").

In *Minkler*, a case that involved defects in the Apple Maps application, it was not enough that the complaint alleged "that Apple made specific representations that Maps would be accurate and improve over time." *Id.*  Similarly, the SAC in this case is not sufficiently specific where it merely alleges that Gierst "issued a 'fix' that was supposed to resolve the problem of leaks occurring," because the allegation also lacks any detail regarding how and to whom the representation was made.  SAC ¶¶ 16, 47; *see Square 1 Bank v. Lo*, 2014 WL 4181907, at *7 (N.D. Cal. Aug. 22, 2014) (dismissing fraud claim because complaint did not allege "how [the allegedly fraudulent statements] were made (e.g., orally or in writing)"); *Saldate*, 686 F. Supp. 2d at 1065 (fraud claims must include names of those to whom statements were made).

The SAC next alleges that Plaintiff was assured by Gale Young, an After Sales Technical and Operations Manager with Mercedes-Benz USA, that "the issue had been fixed, and the AC units would not leak in the future." SAC ¶ 16.  However, the actual statement allegedly made by Mr. Young does not support Plaintiff's characterization. Specifically, the SAC claims that Mr. Young told Plaintiff:

> We have some progress, a new seal, new work instructions but there is another issue effecting the vehicles a leak caused by Condensation from the evaporator when running the AC of full

6

> cold with high blower settings. R&D in Germany is confirming a certain repair procedure that may be performed in addition to replacing a blower control relay. [sic]

*Id.* ¶ 47. In this quote, Mr. Young does not say that the defect had been fixed. Quite the opposite, he said that there had been "some progress," but that "another issue" had been identified. *Id.* He also said that a repair procedure was being confirmed, not that it *was* confirmed, and that this procedure "may be performed" in addition to another service. *Id.* Even when construed in a light most favorable to Plaintiff, this statement does not support Plaintiff's claim that it was reassured that a fix had been issued and future model years would be free of the alleged defect. Additionally, Mr. Young holds an "After Sales" position, which calls into question his authority to speak about the absence of leaks in future model years, and the reasonableness of any reliance upon such an assurance. *See Engalla*, 15 Cal. 4th at 974 (a claim of fraud requires justifiable reliance). Furthermore, the equivocal and conditional nature of Mr. Young's statement, coupled with his "*After Sales*" position, undermines the plausibility of Plaintiff's argument that Mr. Young's statement was intended to deceive Plaintiff into purchasing future model years of the Sprinter vans. *See Mohebbi v. Khazen*, No. 13-3044-BLF, 2014 WL 2861146, at *11 (N.D. Cal. June 23, 2014) ("[c]onclusory statements about" intent to defraud, "without corroborating factual allegations," are "insufficient, standing alone, to adequately allege" a fraud claim).

### D. The SAC Does Not Claim Non-Disclosure or Fraudulent Omission.

Given the weakness of the SAC's allegation of affirmative misrepresentations, Plaintiff's Opposition attempts to rely upon an "omissions" theory of fraud, which formed the basis of Plaintiff's fraud allegation in the FAC. *See, e.g.*, Opp'n at 15 ("Mercedes never made a full and fair disclosure"). Indeed, at oral argument Plaintiff contended that Defendant committed fraud because where it chose to speak, it did not do so "fully." Unfortunately, the SAC does not allege fraudulent omissions; instead, it relies upon a theory of "actual fraud" based upon "representations" made by Defendant. *See* SAC ¶¶

7

16. Because Plaintiff abandoned its fraudulent omissions theory in the SAC, it cannot now revive that theory in its Opposition. *See La v. San Mateo County Transit District*, No. 14-1768-WHO, 2014 WL 4632224, at *9, n. 6 (N.D. Cal. Sep. 16, 2014) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Regardless, Plaintiff's fraudulent omissions theory is unsupported by the SAC's allegations. It is clear from the SAC that Defendant acknowledged the air conditioning defect, and made no effort to hide it from Plaintiff. *See, e.g.*, SAC ¶ 16 (stating that Defendant told Plaintiff it was "aware of the problem"). In fact, the evidence of these disclosures is the same evidence upon which Plaintiff relies for its actual fraud claim. Plaintiff's potential argument that these acknowledgments constitute *partial* disclosure, with the actionable nondisclosure resulting from Defendant's failure to take meaningful steps to resolve the defect, is unavailing in light of the Technical Service Bulletin, which demonstrates that Defendant was making an effort to address the problem. That Plaintiff feels these measures were ultimately ineffective does not constitute fraud.

Finally, the Court notes that greater factual specificity is needed for Plaintiff's fraud allegation, not just to satisfy the pleading requirement, but also because it is presently unclear what Plaintiff knew when it purchased the vans that were later damaged. Plaintiff states that it "began noticing" the leaks "after Mercedes issued the second generation Sprinter van." SAC ¶ 46. Without greater detail, including a more structured timeline of when misrepresentations were made in relation to the purchase of specific, damaged vans, Defendant does not have sufficient notice to assess whether relevant purchases were made under false pretenses.

For the foregoing reasons, the Court DISMISSES WITHOUT PREJUDICE Plaintiff's cause of action for actual fraud.

## II. Unfair Business Practices

California Business and Professions Code section 17200, *et seq.*, known as the Unfair Competition Law ("UCL"), prohibits business practices that are "unlawful, unfair

or fraudulent." "Each of these three adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted). A practice can therefore be "unfair" even if it is not unlawful. *See id.* A plaintiff pursuing a representative UCL claim must show a "requisite injury to themselves." *Birdsong v. Apple, Inc.*, 590 F.3d 955, 961 (9th Cir. 2009).

There is a significant disagreement between California courts regarding the appropriate test for "unfair" business practices in consumer cases like the one here. *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169–71 (9th Cir. 2012) (describing the disagreement). As a result, there are three different tests that can arguably be applied in this case to determine whether Defendant's business practices were "unfair." *See Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1088-89 (N.D. Cal. 2012) (providing these tests).

The first test requires that the disputed action violate a "public policy" that is "tethered to specific constitutional, statutory, or regulatory provisions." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 256 (2010) (citing *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1260–1261 (2006); *Davis v. Ford Motor Credit Co.*, 179 Cal. App. 4th at 581, 595–596 (2009); *Gregory v. Albertson's Inc.*, 104 Cal. App. 4th 845, 854 (2002)).

Under a second test, often referred to as the "balancing test," courts weigh the utility of a defendant's conduct against the gravity of the harm to the alleged victim. *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1114 (1996). Stated another way, a business practice is unfair if it "offends an established public policy," or if it is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Fardella v. Downey Sav. & Loans Ass'n*, No. 00-4393, 2001 WL 492442, at *3, n. 3 (N.D. Cal. May 9, 2001); *Wilner v. Sunset Life Ins.*, 78 Cal. App. 4th 952, 964 (2000). The balancing test continues to be applied to UCL consumer cases by numerous courts. *See, e.g.*, *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007) (noting a split in state case law concerning the appropriate test for consumer cases, but

1   declining to apply the Section 5 Test absent "a clear holding from the California Supreme

2   Court"); *Progressive W. Ins. Co. v. Yolo Cnty. Superior Court*, 135 Cal. App. 4th 263, 286

3   (2005) ("We conclude that the balancing test should continue to apply in consumer

4   cases."); *Fardella*, 2001 WL 492442, at *3, n. 3.

5      Finally, a third test became applicable in 1999, when the California Supreme Court

6   discarded the balancing test within the context of UCL claims alleging anticompetitive

7   practices. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal.

8   4th 163 (1999). The court described the balancing test as "too amorphous," stating that it

9   provided "too little guidance to courts and businesses," and that "[a]lthough the unfair

10  competition law's scope is sweeping, it is not unlimited. Courts may not simply impose

11  their own notions of the day as to what is fair or unfair." *Id.* at 182. Consequently, the

12  court instead applied what is now known as the "Section 5 Test." *Id.* at 185. The Section

13  5 Test finds unfairness where: (1) the consumer injury is substantial; (2) the injury is not

14  outweighed by any countervailing benefits to consumers or competition; and (3) the

15  consumers could not reasonably have avoided the injury. *Camacho v. Automobile Club of*

16  *Southern California*, 142 Cal. App. 4th 1394, 1403 (2006). Subsequent decisions by

17  numerous courts, including this one, have extended the application of the Section 5 Test to

18  UCL consumer cases. *See, e.g.*, *McGough v. Wells Fargo Bank, N.A.*, No. 12-0050-TEH,

19  2012 WL 2277931, at *6 (N.D. Cal. June 18, 2012); *Davis v. Ford Motor Credit Co.*, 179

20  Cal. App. 4th 581 (2009); *Daughtery v. Am. Hondo Motor Co., Inc.*, 144 Cal. App. 4th

21  824, 839 (2006).

22     In this case, Defendant insists that this Court apply the Section 5 Test in dismissing

23  Plaintiff's unfair business practices claim. Mot. at 14. Because Plaintiff's claim survives

24  even this most rigorous of the three tests, the Court applies the Section 5 Test in denying

25  Defendant's motion, even though the other two tests might fairly apply otherwise.

26     First, the SAC sufficiently alleges a substantial consumer injury. The SAC alleges

27  that the damage from the defective air conditioning units "included damage to the vehicle

28  itself but also to cargo being transported in the vehicles, loss of use, loss of goodwill, and

1   having to comp customers for their losses as well." SAC ¶ 51.  Specifically, Plaintiff
2   alleges that at least 83 of the 98 vans it purchased have experienced leaks in and around
3   the AC unit.  *Id.* ¶ 12.  This number represents a significant portion of the purchased vans,
4   and suggests that a sizeable portion of vans purchased by other consumers likely contain
5   the same defect, resulting in similarly substantial injuries.
6       Second, the SAC sufficiently alleges that the injury is not outweighed by
7   countervailing benefits to consumers or competition.  Plaintiff alleges that Defendant knew
8   about the leaks from at least 2010, but nonetheless continued to sell the defective product.
9   *Id.* ¶ 54.  While it is possible that, in earlier years, the harm caused by the defective AC
10  units was outweighed by the benefit to consumers resulting from the availability of this
11  unique product, this cannot be true after competitors began manufacturing similar vehicles.
12  *See id.* ¶ 57 (stating that a viable alternative did not enter the market until 2014).
13  Moreover, construing the facts in a light most favorable to Plaintiff, the Court finds that
14  even in the early years of the vans' production, it is plausible that the harm was not
15  outweighed by any potential benefits, given the significance of the injuries alleged.  *See*
16  SAC ¶ 19 (describing the leaking as "raining" inside the vans).
17      Finally, the SAC sufficiently alleges that the injury was not reasonably avoidable by
18  Plaintiff or other class members.  Plaintiff claims that its business model relied on the
19  features uniquely offered by Defendant's product.  *Id.* ¶ 57.  Accepting Plaintiff's
20  allegations as true, it would not be reasonable to expect Plaintiff to go out of business to
21  avoid the damage caused by the leaking AC units.  Further, other class members could not
22  reasonably avoid the injury because Defendant never informed the public of the vans'
23  defect.  *Id.* ¶ 58.
24      Defendant argues that UCL claims do not apply to defects that arise outside of the
25  warranty period, and that defects arising within the warranty period are only actionable as
26  a breach of warranty. Mot. at 13.  Here, Defendant cites *Daugherty v. Am. Honda Motor*
27  *Co., Inc.*, which held that "the failure to disclose a defect that might, or might not, shorten
28  the effective life span of an automobile part that functions precisely as warranted

11

throughout the term of its express warranty . . . does not constitute an unfair practice under the UCL." 144 Cal. App. 4th 824, 839 (2006). However, *Daugherty* and the other cases cited by Defendant are inapposite, as they address products that function properly during the warranty period, with the defect arising only after the warranty has expired. *See id.* Conversely, Plaintiff alleges that the vans began leaking almost immediately, when it rained or the air conditioning units were operated at their highest setting. *See* SAC ¶¶ 12, 46. Plaintiff is not complaining that the vans failed to "last forever," which is the problem with post-warranty defect claims under the UCL. *See Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1141-42 (9th Cir. 2012). Instead, Plaintiff complains that the vans failed to operate properly from the beginning. Finally, the Court disagrees with Defendant's argument that Plaintiff's only recourse for a within-warranty defect is a breach of warranty claim. If Defendant is correct, then consumers can never sue a manufacturer for a defect under the UCL, as *Daugherty* and its progeny would exclude post-warranty defects, and Defendant's proposed rule would exclude within-warranty defects. This cannot be correct, and the Court has been provided no authority that suggests that it is. A plaintiff is free to seek relief under multiple theories, and the Court can conceive of circumstances where it might be more prudent for a plaintiff to pursue a UCL claim instead of a breach of warranty action. Because the Court finds that Plaintiff's complaint plausibly alleges an unfair business practice under the Section 5 Test, it sees no reason to deny an application of the UCL simply because the defect occurred before the warranties expired.

Accordingly, Defendant's motion to dismiss Plaintiff's unfair business practices claim is DENIED.

### III. Products Liability
#### A. The Economic Loss Rule Does Not Bar Relief.

"The economic loss rule bars recovery in tort for economic damages caused by a defective product unless those losses are accompanied by some form of personal injury or damage to property other than the defective product itself." *KB Home v. Superior Court*,

12

112 Cal. App. 4th 1076, 1079 (2003).  "[T]he economic loss rule allows a plaintiff to recover in strict products liability in tort when a product defect causes damage to 'other property,' that is, property *other than the product itself*.  The law of contractual warranty governs damage to the product itself." *Jimenez v. Superior Court*, 29 Cal. 4th 473, 483 (2002) (emphasis in original).

### 1. Damage to the Product Itself

The SAC alleges that the defective air conditioners caused water damage to the "seating, roof, and walls of the van[s]." SAC ¶ 41.  Defendant contends that the economic loss rule bars recovery in this case because the air conditioners are a part of the van such that the damage from the defective product is to the product itself.  Mot. at 15-16.

When a component of an integrated product is defective and damages other components of the integrated product, there is no damage to "other property," and the economic loss rule bars recovery. *East River S.S. Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 876 (1986).  "Determining the nature of the product at issue and whether the injury for which recovery is sought is to the product itself or to property other than the defective product, at least in cases involving component-to-component damage, is generally the province of the trier of fact." *KB Home*, 112 Cal. App. 4th at 1079.  As a result, a district court should be wary of depriving a plaintiff of their right "to have material issues of fact" concerning the application of the economic loss rule submitted to a jury. *Id.* at 1080.

In *Jimenez*, the California Supreme Court found that the economic loss rule "does not bar a homeowner's recovery in tort for damage that a defective window causes to other parts of [a mass produced] home in which it has been installed." 29 Cal. 4th at 484.  In *KB Home*, a California Court of Appeal identified the facts that should be considered in determining whether the damaged property is "other property," or merely part of the defective product: (1) Does the defective component perform an integral function in the operation of the larger product?  (2) Does the component have an independent use to the

13

consumer - that is, some use other than as incorporated into the larger product? (3) How related is the property damage to the inherent nature of the defect in the component? (4) Was the component itself or the larger product placed into the stream of commerce? (5) Was the component purchased from a different manufacturer? (6) Is the damaged property sold separately from the defective product in some markets? (7) Can the defective product be readily removed from the damaged property? (8) Has the defective product been used in other applications, or has it been listed as a separate part in the product's parts catalog? *KB Home*, 112 Cal. App. 4th at 1086-87.

The Court lacks the necessary information to adequately apply the considerations identified by *KB Home*, or to determine whether the Sprinter air conditioner is appropriately integrated into the van such that the economic loss rule applies as in *East River S.S. Corp*. Consequently, at this early stage of the proceedings, the Court will not bar Plaintiff's claim under the economic loss rule absent sufficient factual development.

### 2. Damage to Other Property

The SAC also alleges damage to "cargo and anything else being transported in the vehicles, including any fixtures that were installed by the owners." SAC ¶ 2. In response, Defendant contends that Plaintiff has failed to state a claim because the SAC does not specifically identify the fixtures or property damaged. Mot. at 16-17.

The fact that the SAC does not specifically identify the fixtures and cargo damaged is of no consequence. Federal Rule of Civil Procedure 8 does not require a heightened degree of specificity for products liability. *See Duffin v. Honeywell Int'l, Inc.*, 312 F. Supp. 2d 869, 872 (N.D. Miss. 2004) ("A complaint does not need a great deal of specificity to convey that plaintiffs are seeking to hold retailers liable under a strict products liability theory.") While Defendant is correct that Plaintiff cannot rely upon damage to cargo that belongs to someone else, Mot. at 16-17 (citing *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 841 (N.D. Ill. 2002) ("[P]laintiffs cannot rely on harm to property belonging to other people to show a non-economic injury. They must

14

have an ownership interest in the property.")), it is enough that the SAC alleges damage to fixtures installed by Plaintiff. SAC ¶¶ 2, 41; s*ee Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 877 (1997) (holding that equipment added by a user constitutes "other property"); *Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 189 (N.D.N.Y. 2009) ("the property inside of the motor home is property separate and apart from the motor home").

Defendant also notes that liability can only attach to those vans that contained a defective air conditioner. Mot. at 16. While this is true, the SAC alleges that at least 83 of its vans leaked. SAC ¶ 12. The extent of the defect and resulting damage are details that must be assessed at later stages of litigation. The fact that Plaintiff has not detailed the extent of the damage in each individual van does not result in a dismissal under Rule 12(b)(6) where the Complaint alleges sufficient facts to state a plausible claim that Plaintiff's fleet was materially defective, Defendant is liable for the defect, and the defect resulted in harm to Plaintiff's fixtures and/or other property.

### B. Assumption of Risk Does Not Apply.

"Ordinary contributory negligence does not bar recovery in a strict liability action." *Luque v. McLean*, 8 Cal. 3d 136, 145 (1972). "The only form [of] plaintiff's negligence that is a defense to strict liability is that which consists in voluntarily and unreasonably proceeding to encounter a known danger, more commonly referred to as assumption of risk." *Id.* "For such a defense to arise, the user or consumer must become aware of the defect and danger and still proceed unreasonably to make use of the product." *Id.* Affirmative defense can only be considered on a motion to dismiss "where the allegations in the complaint suffice to establish the defense." *Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013). Assumption of risk becomes a question of law only "when the evidence in the case is clear, direct, and undisputed." *Mappin v. Atchison, T. & S.F. Ry. Co.*, 198 Cal. 733, 742 (1926).

15

1	Defendant contends that "[i]t sounds in common sense and basic fairness that when
2 a plaintiff makes a business decision with full awareness of the risks involved, it cannot
3 recover for an economic loss when those risks come to pass." Mot. at 17. Consequently,
4 Defendant argues, Plaintiff should not be able to recover for economic loss resulting from
5 defects in the Sprinter vans where it knew of those defects and nonetheless continued to
6 purchase them throughout the class period. *Id.* While not called as such, this argument is
7 essentially an assumption of risk defense.

8	Defendant relies upon largely inapposite authority in an attempt to apply
9 assumption of risk to the facts of this case. As explained by Plaintiff's Opposition, none of
10 Defendant's cases address product liability. Opp'n at 6. Instead, they involve breach of
11 warranty and deceptive business practices claims, with defenses specific to those claims
12 such as the voluntary-payment doctrine. Furthermore, Defendant's argument is
13 substantively unconvincing. While Plaintiff knew that previous models of the Sprinter
14 vans contained an air conditioning defect, it is not beyond dispute that Plaintiff
15 affirmatively accepted the risk that future models would contain the same defect,
16 especially where it had reported the problem and was told that Defendant was in the
17 process of addressing the defect. Consequently, it cannot be said that an assumption of
18 risk is demonstrated by the "clear, direct, and undisputed" evidence currently available to
19 the Court. *Mappin*, 198 Cal. at 742. It is possible, however, that assumption of risk will
20 bar recovery for any damage that resulted from Plaintiff's decision to continue using vans
21 that it knew contained the defect. However, because Defendant did not raise this argument
22 within the context of the present motion, and a finding on assumption of risk is generally
23 to be avoided at the motion to dismiss stage, the Court does not need to make a
24 determination as to such an argument's merit.

25	Because the SAC sufficiently alleges a cause of action for products liability, and the
26 affirmative defense of assumption of risk is not presently appropriate, the Court DENIES
27 Defendant's motion to dismiss Plaintiff's products liability claim.
28

16

## IV. Declaratory Relief

Finally, Defendant asks the Court to dismiss Plaintiff's request for declaratory relief because it is duplicative. Mot. at 18-19. The decision to dismiss a request for declaratory relief is within the discretion of the Court. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Plaintiff argues that the cases cited by Defendant are inapposite because they all address the dismissal of a request for declaratory relief within the context of breach of contract actions. Opp'n at 16-17. Further, Plaintiff notes that some courts have declined to dismiss a declaratory relief request where there is a potential for meaningful declaratory relief even if the plaintiff fails to prevail on its other claims. *Id.* (citing out-of-circuit cases). Importantly, Defendant has not shown that any prejudice would result from allowing this claim to proceed. Accordingly, at this early stage, the Court finds that it is premature to foreclose the possibility of declaratory relief and therefore DENIES Defendant's motion to dismiss Plaintiff's request for declaratory relief.

## CONCLUSION

For the reasons articulated above, the Court GRANTS Defendant's motion to dismiss Plaintiff's claim of actual fraud. Dismissal of this cause of action is WITHOUT PREJUDICE. The Court DENIES Defendant's motion to dismiss Plaintiff's unfair business practices and products liability claims, as well as Plaintiff's request for declaratory relief. Plaintiff is granted leave to amend, and shall file an amended complaint on or before **April 28, 2015**. Failure to file a timely amended complaint shall result in dismissal with prejudice of Plaintiff's cause of action for actual fraud.

**IT IS SO ORDERED.**

Dated:   04/07/15

THELTON E. HENDERSON
United States District Judge